UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

NANCY E. FAY,              )
                                     )
           Plaintiff,      )
                                     )     Case No. 1:10-cv-0920-DML-WTL
      v.                    )
                                     )
MICHAEL J. ASTRUE,    )
Commissioner of the        )
Social Security Administration,  )
                                     )
           Defendant.     )

## Order on Judicial Review

Plaintiff Nancy Fay has brought this action seeking review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying her applications

for Social Security Disability Insurance and Supplemental Security Income benefits ("benefits")

under Titles II and XVI, respectively, of the Social Security Act.

Ms. Fay applied for benefits on June 4, 2004, alleging a disability onset date as of June

15, 2003.[1] Through a variety of administrative proceedings, including a November 2005 hearing

at which she appeared with counsel before Administrative Law Judge Ann Rybolt ("ALJ"), the

Commissioner denied her application for benefits. Ms. Fay appealed to this court, and the court

reversed and remanded to the Commissioner. *Fay v. Barnhart*, No 1:06-cv-1262-JDT-TAB,

2007 U.S. Dist. LEXIS 74528 (S.D. Ind. Sept. 27, 2007). On remand, Ms. Fay appeared at a

second hearing with counsel before the same ALJ on July 2, 2008. The ALJ again denied her

---

[1]  The administrative law judge later determined that the date of onset could be no earlier than
August 30, 2003, because Ms. Fay had engaged in substantial gainful activity through August
2003. 20 C.F.R. §§ 404.1572 and 404.1574. Ms. Fay does not contest this finding.

application.  The Appeals Council denied review, and Ms. Fay has now requested review of the ALJ's second decision as provided by 42 U.S.C. § 405(g).[2]

## I.  The Evidence before the ALJ

Ms. Fay was 54 years old at the onset of her alleged disability, 56 years old on the date of the ALJ's first decision, and 59 years old on the date of the ALJ's second decision.  She has been diagnosed with physical and mental impairments, including fibromyalgia, osteopenia, depression, and anxiety.

**A.  Education and Employment History**

Ms. Fay graduated with a Bachelor of Arts degree from Indiana University ("IU") in General Studies in 2007.  At the time of the second hearing, she was a part-time student in the Library Sciences graduate program at Indiana University Purdue University, Indianapolis. Before obtaining her college degree, she worked as an office coordinator at the IU African American Art Institute from 1995-2002 but left because she wanted a job with more narrowly defined responsibilities.  Later, she worked for Hospice of Central Indiana as a design specialist from February 2002 to July 2003, when she took a brief medical leave.  After that, Ms. Fay's position at the hospice was eliminated.

**B.  Medical History**

1.  <u>Treating Physicians</u>

On April 30, 2003, Dr. Tracy Salinas reported that Ms. Fay's fibromyalgia had been exacerbated by a car accident.  Ms. Fay complained to Dr. Salinas of difficulty sleeping and depression, and said her boss did not think she could keep up at work.  After Ms. Fay

---

[2]  The parties have consented to the magistrate judge conducting all proceedings in this matter, including the entry of judgment, as provided by 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

complained of more pain, depression, and fatigue, Dr. Salinas assessed Ms. Fay on May 16, 2003, as suffering from fibromyalgia, depression, and insomnia.  More of the same complaints followed on June 5, 2003, when Dr. Salinas signed, at Ms. Fay's request, a work restriction limiting Ms. Fay to a forty-hour work week in a stress-free, quiet environment because of fibromyalgia and anxiety.  The next day, Dr. Salinas provided a new statement that Ms. Fay could return to work on June 12, 2003, for half days.[3]  Dr. Salinas saw Ms. Fay four more times from June 2003 to March 2004.  At these four visits, Ms. Fay complained of depression and parasthesias (feelings of "pins and needles").  Examinations by Dr. Salinas were unremarkable.  Dr. Salinas ultimately concluded that chronic implications, such as pain and sleep deprivation, were associated with fibromyalgia and were exacerbated in stressful situations.  She concluded that Ms. Fay could return to gainful employment in one to two years but could hold only a flexible job with accommodations for her fatigue and other various moderate limitations.  She opined that Ms. Fay currently could work part-time and "was mentally incapable of dealing with any normal amount of stress in a regular day."

Dr. Alan Watanabe, an internist whom Ms. Fay saw for acupuncture treatment, also diagnosed her with fibromyalgia.  Ms. Fay began acupuncture treatments on July 30, 2003, and noted improvement in her fibromyalgia symptoms but said she had existing neck tightness.  Ms. Fay continued to improve until she visited Dr. Watanabe on November 20, 2003, when he reported that Ms. Fay was incapacitated and unable to perform work for a period of time, although she had improved substantially.  On October 21, 2004, Ms. Fay reported to Dr. Watanabe symptoms of feeling cold easily, stiffness in her neck, upper back, and hands, and flu-like achiness; he concluded that her fibromyalgia was uncontrolled.  Seven days later, Dr.

---

[3]   Ms. Fay had taken a brief leave after she told Dr. Salinas she needed time off work for physical therapy.

Watanabe opined that Ms. Fay has "severe fibromyalgia that caused extreme fatigue, sleep disturbance, severe intolerance because of environmental changes, heightened sensation to physical stimuli, and no adequate relief so she was unable to maintain employment."

Dr. J. Michael Condit, a rheumatologist who had previously diagnosed Ms. Fay with fibromyalgia in July 2002, saw her again in October 2004. At that appointment, Ms. Fay complained of trouble sitting and concentrating for prolonged periods, difficulty remembering, anxious feelings, aches and pains, stiffness, and exhaustion from walking. His examination revealed some tender points and his impression was fibromyalgia exacerbated by the car accident. He saw her again in October 2005, when she reported symptoms of intense pain in most of her body, rating it as a 9 out of 10 on a pain scale. Dr. Condit's impression was that she had multiple tender points and seemed to be depressed and fatigued but was not in an unusual amount of pain.

        2.      <u>State Agency Physicians</u>

In August 2004, Dr. Richard Karkut, a clinical psychologist who performed a consultative mental status exam, opined that Ms. Fay had a generalized anxiety and adjustment disorder with a depressed mood and that she "didn't report symptoms associated with major depression." Although sleep and appetite disturbances could be symptoms of depression, Dr. Karkut found these were related to Ms. Fay's physical ailments. Dr. Karkut found that Ms. Fay's self-deprecation, depressed mood, and difficulty concentrating were depressive symptoms. Psychological tests adjudged Ms. Fay capable of abstract reasoning, with an adequate immediate, recent, and remote memory, adequate judgment and insight, and adequate general fund of

information.  Dr. Karkut assigned her a GAF[4] score of 60 currently and as high as 70 in the past year.

In September 2004, Dr. D. Unversaw, a psychologist, opined that Ms. Fay did not have a severe mental impairment and had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Dr. F. Kladder, a second state agency psychologist, affirmed that opinion.

Dr. Jeffrey Wichman performed a consultative physical evaluation of Ms. Fay on July 31, 2004.  Ms. Fay reported fatigue and tender areas of muscles; his clinical impressions were fibromyalgia and chronic fatigue syndrome. He found that her gait, ambulation, range of motion, and muscle strength were normal.  He opined that Ms. Fay was able to stand two hours in an eight-hour work day.

## C.     Ms. Fay's Testimony

At her second hearing in 2008, Ms. Fay testified that she has been unable to work because of difficulties processing information under stress (Tr. 541), dealing with cold (*i.e.* air conditioning), sitting for a prolonged period of time (Tr. 542), concentrating in a noisy environment (Tr. 543), and because she suffers from fatigue and pain.  (Tr. 545)

### 1.     Education

Ms. Fay completed her undergraduate degree with a 4.0 GPA but said it took her a long time and required accommodations from professors.  (Tr. 541-43)  Some professors allowed her

---

[4]   The GAF scale measures a "clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32-34 (2000).  It requires assessing a current level of symptom severity and functioning and adopting the lower of the two score.  *Id.*  The range of scores indicating serious symptoms begins at 41 and ends at 50; the range for moderate symptoms begins at 51 and ends at 60; and the range for mild symptoms begins at 61 and ends at 70.  *Id.*

extra time to take tests because she struggled to concentrate with other people in the room.  (Tr. 542-43)  She was allowed to leave class to ease her stiffness or to run warm water over her fingers.  *Id.*  She wore gloves and could bring a blanket or heating pad to class to ameliorate her sensitivity to cold.  *Id.*  Ms. Fay said she napped after class because of fatigue.  (Tr. 548)

Toward the completion of her bachelor's degree, Ms. Fay tutored other students for school credit.  (Tr. 530)  She set her own hours and worked no more than three times per week. (Tr. 531)

Ms. Fay's graduate school work has been on a part-time basis, limited to one or two online classes per semester, which provides flexibility.  (Tr. 553)  She spends about four hours on the computer each day completing coursework but gets up every ten to fifteen minutes to relieve pain and stiffness.  (Tr. 554-55)

2.    Sleep

Ms. Fay has been taking Amitriptyline to help her sleep.[5]  (Tr. 545)  She usually sleeps ten to twelve hours a night but wakes up one to four times each night.  (Tr. 549, 546)  Sometimes she takes more medicine to fall back asleep.  *Id.*  She takes one to two hour naps after three hours of activity some days; other days, she takes fifteen to thirty minute naps.  (Tr. 566)

3.    Hobbies/Activities

Ms. Fay said she tries to do yoga, stretches, and walk for ten to fifteen minutes to relieve stiffness.  (Tr. 566, 556).  She drives but limits her driving, especially on days when she is very fatigued, fearing she will fall asleep at the wheel. (Tr. 527, 561)  She plays the flute in the Columbus Indiana Symphony Orchestra.  (Tr. 556-57)  The orchestra practices every Tuesday,

---

[5]  Dr. Boyce testified that Amitriptyline can be used for treating depression and as a sedative. Based on Ms. Fay's dosage, he opined she used it as a sedative, and Ms. Fay concurred that she used it to help her sleep.

but she is able to attend only a fourth or third of the practices. *Id.* The orchestra plays a concert once every few weekends from September to July, but she attends only one or two because of her condition. *Id.*

        4.      <u>Household Activities</u>

Ms. Fay cooks minimally. She has cold cereal, a salad, and a microwaveable frozen dinner each day. (Tr. 551-52) She shops for groceries when her daughters cannot do it for her (Tr. 551), does laundry once a month (Tr. 565), handles her finances, and cares for her pets. (Tr. 550-52) Ms. Fay lives alone, but her daughters and son-in-law do the major grocery shopping, vacuuming, mopping, and grooming of her pets. (Tr. 549-50)

Ms. Fay explained that her symptoms cause her to have good and bad days and make it difficult for her to socialize because she has become short-tempered. (Tr. 561, 558) Ms. Fay has not received any mental health treatment besides medication prescribed to help her sleep.[6] (Tr. 547-48)

**D.     Medical Expert Testimony**

Dr. Paul Boyce, who is board certified in internal medicine, testified at the second hearing. He had reviewed all of Ms. Fay's medical records and opined that Ms. Fay did not in fact have fibromyalgia. (Tr. 570) He explained that the doctors who had diagnosed Ms. Fay had not consulted the protocol in the American College of Rheumatology, which requires a criteria of eleven tender points out of eighteen at a given examination to support a diagnosis of fibromyalgia. (Tr. 569) According to his review of the records, Dr. Boyce could identify at most only ten tender points at a given examination. (Tr. 570)

---

[6] Ms. Fay had taken some medications for depression in the past. At the date closest to the second hearing, Ms. Fay's medications included only Flexeril and Ultram, neither of which is used to treat depression or anxiety.

E.    **Vocational Expert Testimony**

Vocational Expert Robert Barber testified that Ms. Fay could perform her past work as a design technician or budget coordinator.[7]  (Tr. 589)  In the Dictionary of Occupational Titles, a design technician is classified as light, skilled, and with a specific vocational preparation ("SVP") of five.  A budget coordinator is classified as sedentary, skilled, and with an SVP of five.  Further, Mr. Barber testified that skills Ms. Fay obtained in her past work would be transferable to lesser skill jobs, including the skills of calculating, computing, compiling, and coordinating data, interpersonal skills, and "probably" attention to detail.  (Tr. 584)  The ALJ posed two hypotheticals to Mr. Barber that included a modified form of light work with no mental limitations.  Mr. Barber responded that under both hypotheticals Ms. Fay could return to her past relevant work.  (Tr. 589)  In response to Ms. Fay's counsel's question whether a design technician or a budget coordinator would require mental focus and concentration, Mr. Barber said they would require "ample focus and concentration."  (Tr. 590)  Further, Mr. Barber testified that if Ms. Fay's testimony were totally credible, there would be no jobs she could perform.  (Tr. 590)

## II.    The Decisional History

A.    **The Five-Step Analysis**

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment(s) which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A).  In order to qualify for disability benefits, a claimant

---

[7]    According to Mr. Barber, Ms. Fay's description of her role at IU is consistent with that of a budget coordinator, even though different terminology, such as office coordinator, may have been used throughout the hearing.

must demonstrate that her physical or mental limitations prevent her from doing not only her previous work but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity she is not disabled despite her medical condition. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in significant numbers in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

B.      **The ALJ's First Decision**

In her first decision, issued January 23, 2006, the ALJ found at step two that Ms. Fay had severe impairments of fibromyalgia, pain and fatigue secondary to fibromyalgia, depression, and generalized anxiety. (ALJ's 1st Opinion, Tr. 482) At step three, she found that Ms. Fay's physical and mental impairments, alone or in combination, did not meet or medically equal the requirements for Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (1st Opinion, Tr. 483) At step four, the ALJ determined that Ms. Fay was capable of performing modified light work that did not require production quotas. (1st Opinion, Tr. 487) Relying

largely on vocational expert testimony, the ALJ determined that given Ms. Fay's RFC, she could not perform her past relevant work (primarily because of her "state of mind" and because her past jobs required "skill, precision, and diplomacy") but could perform semi-skilled sedentary jobs available in significant numbers in Indiana. (1st Opinion, Tr. 487-488)

## C.    District Court's Remand

This court remanded to the Commissioner following the first decision denying benefits to Ms. Fay because the ALJ's articulation of Ms. Fay's mental impairments and her resultant functional limitations was incomplete, inconsistent, and sometimes contradictory. Then-District Judge Tinder instructed the Commissioner to "specifically address the mental-activities factors in determining Ms. Fay's [residual functional capacity] and ground those conclusions in the evidence," to include "any and all of those mental limitations . . . in the hypothetical question(s) presented to a vocational expert," and to ensure an "accurate and logical bridge exists between the evidence and each conclusion." *Fay*, 2007 U.S. Dist. LEXIS 74528, at *16 (internal quotations omitted).

On appeal, this court found fault with the ALJ's consideration of Ms. Fay's mental condition. On the one hand, it "appear[ed]" to Judge Tinder that the ALJ believed Ms. Fay suffered from mental impairments limiting her work ability, but on the other hand, the ALJ had not included a function-by-function analysis of those mental limitations as provided in 20 C.F.R. 404.1545(c)[8] in order to determine their effect on her residual functional capacity ("RFC").[9] *Id.*

---

[8]   The relevant sections of the Social Security Disability regulations are virtually the same as the Supplemental Social Security Income regulations, and for simplicity, the court cites to the former. The parallel sections of the Supplemental Social Security Income regulations are located at 20 C.F.R. § 416.900 and 20 C.F.R. §§ 416.1400-416.1499.

at *6-*8.  Further, this court identified inconsistencies in the ALJ's findings that Ms. Fay's depression and anxiety affected her attention to detail to the extent she could not return to her past relevant work, but that her attention to detail obtained in past employment was transferable to other potential employment opportunities.  *Id.* at *9-*10.  Judge Tinder held that the ALJ's selection of mental limitations is appropriate only if grounded in the evidence and included in the RFC.  *Id.* at *9.  Because of these inconsistencies, he directed the ALJ on remand to "articulate her acceptance or rejection of the opinions relating to Ms. Fay's nonexertional limitations."  *Id.* at *15.

Following remand, the ALJ scheduled a second hearing, held July 2, 2008, and on March 4, 2009, issued her decision denying benefits.

Ms. Fay asks the court to reverse and remand to the Commissioner again on the grounds that (1) the ALJ erroneously reconsidered (and changed) her original step two finding as to whether Ms. Fay had severe mental impairments; (2) the ALJ failed to follow this court's remand order because she did not perform a function-by-function mental RFC assessment at step four; and (3) the ALJ's credibility determination and RFC were flawed because of an incomplete and skewed evaluation of Ms. Fay's activities of daily living.

## D.    The ALJ's Second Decision

The ALJ's understanding of the court's remand order was that she was to give "additional consideration" to Ms. Fay's mental impairments and any restrictions or limitations as a result of any mental impairment. (ALJ's 2nd Opinion, Tr. 375)  On remand, the ALJ found at step two that

---

[9]   The only likely mental limitation included in the RFC was a restriction on "work involving production quotas," but the court was puzzled how this limitation fit the evidence and the ALJ's assessment of it.  *Fay,* 2007 U.S. Dist. LEXIS 74528, at *7.

Ms. Fay had one severe impairment – fibromyalgia.[10] (2nd Opinion, Tr. 378)  The ALJ determined that Ms. Fay did not have severe mental impairments of depression and anxiety.  She reasoned that Ms. Fay had received no mental health treatment, did not take any medication for anxiety, and that her "activities of daily living are illustrative of an individual who is not experiencing severe depression or anxiety." (2nd Opinion, Tr. 381)[11]  The ALJ noted Dr. Karkut's findings that Ms. Fay had adequate recent, immediate, and remote memory, adequate abstract reasoning and judgment, and did not report "the collection of symptoms associated with major depressive episodes."  (2nd Opinion, Tr. 382)  She also pointed to the reports of state agency reviewing psychologists Drs. Unversaw and Kladder, who each found that Ms. Fay had no severe mental impairments based on objective medical evidence and that her mental limitations were only mild.

At step three, the ALJ consulted the most analogous listings for fibromyalgia because there is not a particular listing for that impairment: 1.02 (major dysfunction of a joint(s)) and 14.06 (undifferentiated and mixed connective tissue disease).  She found that Ms. Fay did not meet or medically equal either listing, a determination not challenged here.

At step four, the ALJ found Ms. Fay had the RFC to perform light work with the following limitations:

---

[10]   The ALJ was even skeptical that Ms. Fay suffered from fibromyalgia, based on Dr. Boyce's testimony that Ms. Fay did not have at least eleven of the eighteen tender points required for a fibromyalgia diagnosis.  The ALJ explained that she was unaware of this diagnostic protocol for fibromyalgia at Ms. Fay's first hearing.  Because of the circumstances, the ALJ gave Ms. Fay the benefit of the doubt and found that she suffered from fibromyalgia, and that it was a severe impairment.

[11]   The ALJ noted, for example, that Ms. Fay lives by herself and manages her household, that she has no difficulty being around crowds of people (illustrated by her participation in the symphony orchestra), that she completed her bachelor's degree with a perfect GPA, and that she was enrolled in graduate school.

> Lift, carry, push, and pull up to twenty pounds occasionally and ten pounds frequently . . . stand and/or walk for a total of six hours during an eight-hour work day with an option to sit for five minutes each hour, at her work station . . . can sit for a total of six hours during an eight-hour day, with an option to stand for five minutes each hour, at her work station . . . can occasionally climb stairs and ramps, balance, stoop, crouch, kneel, and crawl . . . cannot climb ladders, ropes, and scaffolding . . . nor can she perform work involving heights or the operation of hazardous moving machinery.

(2nd Opinion, Tr. 384)

For the RFC assessment, the ALJ relied on the opinions of Drs. Boyce, Karkut, Unversaw, and Kladder because their opinions were based on objective medical evidence.

The ALJ questioned Ms. Fay's credibility concerning the "intensity, persistence, and limiting effects" of her symptoms. (2nd Opinion, Tr. 388) She did not believe all of Ms. Fay's testimony and, among other things, cited doctors' assessments that Ms. Fay did not seem to be in as much pain as she reported. The ALJ also did not think Ms. Fay's activities of daily living were indicative of someone with as many limitations as Ms. Fay alleged. She believed Ms. Fay was overstating her symptoms.

Based on the RFC and the vocational expert's testimony, the ALJ determined that Ms. Fay could return to her past relevant work as a design technician or budget coordinator. (2nd Opinion, Tr. 389)

### III.  STANDARD OF REVIEW

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to

articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into [her] reasoning . . . [and] build an accurate and logical bridge from the evidence to [her] conclusion." *Id.*

## IV. DISCUSSION

Ms. Fay presents three arguments for reversal and remand. First, she claims the ALJ erred at step two by finding that her only severe impairment is fibromyalgia. Second, she claims the ALJ erred at step four by not performing a function-by-function mental RFC assessment as the court directed in its remand order. Lastly, she claims the ALJ provided an incomplete analysis of Ms. Fay's activities of daily living, which resulted in flawed credibility and physical limitations findings.

## A.    Step Two Analysis

Ms. Fay contends that the law of the case doctrine prohibited the ALJ from changing her finding in the first opinion that Ms. Fay had severe impairments of depression and anxiety to a finding in the second opinion that Ms. Fay's depression and anxiety were not severe mental impairments.[12] The law of the case doctrine applies to judicial review of Social Security appeals, *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998), and requires that "once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir.

---

[12]    Although Ms. Fay's opening brief complains that the ALJ altered her step two findings even though step two had not been challenged in the initial appeal, she did not argue that the law of the case was an independent basis for remand. Apparently prompted by one of the Commissioner's assertions, she first raised the argument in her reply brief.

1991).  Whether an ALJ violated the law of the case is best determined "by carefully considering the scope of the district court's remand order." *Id.* at 1061.  "If an issue is left open after remand, the lower tribunal is free to decide it*." Id.*

Here, the court's remand order left open for reconsideration the issue of whether Ms. Fay's mental impairments limited or restricted her ability to work.  The court instructed the Commissioner to clarify inconsistencies in findings related to Ms. Fay's mental impairments and to ground subsequent conclusions in evidence.  In her second opinion, the ALJ articulated that she understood that this was the purpose of the remand.  Specifically, the order required the Commissioner to "address the mental-activities factors in determining Ms. Fay's RFC and ground those conclusions in the evidence," *Fay*, 2007 U.S. Dist. LEXIS 74528, at *16, and to include "[a]ny and all" mental limitations in the hypothetical question(s) to a vocational expert. *Id.*  The Commissioner was directed to ensure "that an accurate and logical bridge exists between the evidence and each conclusion . . . ." *Id.* (internal quotations omitted).

This case is unlike *Key*, in which the Seventh Circuit determined that an ALJ had acted outside the scope of the remand order and inconsistent with the law of the case.  925 F.2d at 1061.  In *Key*, the case was remanded for the narrow purpose of requiring the ALJ to "define the physical exertion required of an assembler" because the ALJ had made only a conclusory statement that assembler work was sedentary.  *Id.* at 1058.  On remand, the ALJ concluded that the claimant could perform sedentary and light work.  On appeal, the Seventh Circuit held that the ALJ had violated the law of the case because the district court, which had first remanded the case, "reached the same conclusion about [the claimant's] past relevant work, because it stated that 'the ALJ failed to define the physical exertion required of an *assembler*.'"  *Id.* at 1061.

Here, the court's remand order was much broader and less defined than that in *Key*.  The remand never stated or assumed that Ms. Fay had severe mental impairments. In fact, the court was perplexed by the ALJ's entire analysis of Ms. Fay's mental limitations, if any.  The court specifically noted, as one inconsistency, that at one point in her decision the ALJ indicated a belief that Ms. Fay suffered from severe mental impairments but that in other portions of her opinion she rejected limits on Ms. Fay's working ability on the basis of mental infirmities.  *Fay*, 2007 U.S. Dist. LEXIS 74528, at *6-*8 and *9-*10.  Judge Tinder expressly directed the ALJ on remand to "articulate her *acceptance or rejection* of the opinions relating to Ms. Fay's nonexertional limitations."  The court did not expressly or impliedly decide that issue; rather, it expressly left that issue open for the ALJ to determine.

On remand, the ALJ repaired the contradictions and inconsistencies in her first opinion and provided thorough analysis for her conclusion that Ms. Fay did not suffer from a severe mental impairment.  Her determination was supported by the opinions of Drs. Unversaw and Kladder, state agency medical psychologists, who found Ms. Fay's mental impairments to be non-severe and whose opinions Ms. Fay has not challenged.  The ALJ also adopted their findings that Ms. Fay suffered from mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation.  The ALJ also relied on Dr. Karkut, a psychologist who conducted the only mental status examination of Ms. Fay, who opined that Ms. Fay did not report symptoms associated with major depressive episodes, and who documented that Ms. Fay's "recent, immediate, and remote memories were adequate; reasoning and judgment were adequate."  Lastly, the ALJ based her determination on Ms. Fay's testimony, particularly regarding her activities of daily living, finding that they were inconsistent with the daily

activities of someone suffering from severe mental impairments of depression and anxiety. This evidence is sufficient to support the ALJ's finding that Ms. Fay's mental impairments were not severe.

Ms. Fay contends that this court, by necessary implication, affirmed the step two determination in the ALJ's first opinion because if it had disagreed with the ALJ's step two determination that Ms. Fay had severe mental impairments, it would have affirmed the first time around because the lack of a function-by-function mental RFC assessment would have been harmless, citing *Calderon v. Astrue*, 683 F.Supp.2d 273 (E.D.N.Y. 2010), as support. But *Calderon* supports the ALJ's decision to revisit her assessment of Ms. Fay's mental capacity. *Calderon* recognizes that "a district court's remand may implicitly authorize the ALJ to reconsider issues not raised on appeal." *Id.* At 277. For example, a remand to develop the record could require the ALJ to reassess the medical evidence and in turn, reassess prior findings "as to the nature and severity of claimant's impairments." *Id.* Ms. Fay's logic on this point is also based on a faulty premise. Judge Tinder had no occasion to agree or disagree with the ALJ's determination at step two that Ms. Fay had severe mental impairments; rather, he found fault in the ALJ's inconsistent statements on the issue.

Here, the court's remand order directed the ALJ to analyze more thoroughly the medical evidence. The ALJ's compliance with that directive led her to reassess her prior finding that Ms. Fay had severe mental impairments. Moreover, even if the court had opined in its first decision that it disagreed with the ALJ's findings at step two and thought that Ms. Fay did not suffer from severe mental impairments, it would not have necessarily affirmed on the basis of harmless error, because the ALJ is required to "consider limitations and restrictions imposed by all of an

individual's impairments, even those that are not 'severe'" in the RFC assessment.  SSR 96-8p,

20 C.F.R. 404.1545(a)(2).

The ALJ did not err by deciding on remand that Ms. Fay's only severe impairment was

fibromyalgia.

**B.      ALJ's Step Four Analysis**

Ms. Fay contends that the ALJ erred by not conducting a function-by-function mental

RFC assessment as the court ordered.  Even though the ALJ found that Ms. Fay's mental

impairments were not severe, she was still required to consider whether the RFC should reflect

limitations caused by any impairment, severe or not.  SSR 96-8p; 20 C.F.R. 404.1545(a)(2).  At

step four, the ALJ is required to identify Ms. Fay's functional limitations or restrictions and

assess her work-related abilities on a function-by-function basis, including the functions in 20

C.F.R. 404.1545;  SSR 96-8p.  The function-by-function analysis requirement can be met by

completing a "narrative discussion of a claimant's symptoms and medical source opinions . . . ."

*Knox v. Astrue*, No. 08-3389, 2009 WL 1747901, at **5 (7th Cir. June 19, 2009).  Further, the

ALJ need not conduct a function-by-function analysis "for medical conditions or impairments

that the ALJ found neither credible nor supported by the record."  *Bayliss v. Barnhart*, 427 F.3d

1211, 1217 (9th Cir. 2005); s*ee* SSR 96-8p.

The ALJ made a proper mental limitations RFC assessment by completing a narrative

discussion of Ms. Fay's symptoms and medical source opinions, despite the fact that the ALJ did

not find her mental impairments credible or supported by the record.  A narrative discussion

"describ[es] how the evidence supports each conclusion, citing specific medical facts (*e.g.,*

laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p.

It requires a discussion of symptoms alleged and medical opinions.  *Id.*  For symptoms alleged,

the ALJ must analyze objective evidence, inconsistencies in the evidence, and logically explain any effects of those alleged symptoms. *Id.* For medical opinions, the ALJ must explain why opinions were not adopted. *Id.*

Here, the ALJ completed each of these requirements. In determining whether Ms. Fay's depression and anxiety were severe, she thoroughly discussed Ms. Fay's activities of daily living. (2nd Opinion, Tr. 381-82, 385-86) She discussed objective medical testing, including that Dr. Karkut's examination revealed a normal mental status and that state agency psychologists found Ms. Fay to suffer from only mild mental limitations. (2nd Opinion, Tr. 382) The ALJ also discussed Ms. Fay's symptoms, as she had reported them, and found Ms. Fay exaggerates her symptoms. (2nd Opinion, Tr. 385-86) She found that Ms. Fay's self-reports and symptoms regarding pain and fatigue were inconsistent with the doctors' findings. For example, she told Dr. Condit her pain was a 9 out of 10, but Dr. Condit did not think she seemed to be in acute distress. A similar interaction occurred with Dr. Watanabe. (2nd Opinion, Tr. 388) The ALJ also explained that the opinions of Drs. Salinas, Watanabe, Smith, and Wichman were not given controlling weight because they were based only on Ms. Fay's self-reports rather than objective medical evidence. (2nd Opinion, Tr. 387)

The ALJ's narrative discussion met all of the requirements in SSR 96-8p. The ALJ did not err by not separately performing a function-by-function mental RFC assessment, because she found that Ms. Fay's mental symptoms did not require special limitations or restrictions in the RFC. That finding is supported by substantial evidence.

## C. Credibility and Activities of Daily Living Analysis

As a separate argument, Ms. Fay contends that the ALJ's decision is based on a "flawed credibility determination and a subsequent faulty determination of Ms. Fay's physical abilities

and limitations" because the ALJ's discussion of Ms. Fay's activities of daily living is incomplete.  She further claims these flaws led the ALJ to conclude erroneously that Ms. Fay's activities of daily living support the finding that she can sustain full-time work.

      1.    <u>Standard for Evaluating Credibility</u>

An ALJ is required to consider a claimant's statements about her symptoms and how they affect her daily life and ability to work, 20 C.F.R. § 404.1529(a), but is not required to accept blindly the claimant's statements.  *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996) (ALJ not required to give full credit to every statement of pain or find a claimant disabled because she does not think she can work).

A two-part test determines whether a claimant's description of her own limitations contribute to a finding of disability.  First, the claimant must provide objective medical evidence of an impairment or combination of impairments that could be expected to produce the symptoms she alleges.  Second, the ALJ must consider the intensity and persistence of the alleged symptoms.  20 C.F.R. § 404.1529(a)-(c).  The ALJ must consider the claimant's subjective complaints in light of the relevant medical evidence, as well as any other evidence of the following factors:

(i)      The claimant's daily activities;

(ii)     Location, duration, frequency, and intensity of pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)    Type, dosage, effectiveness, and side effects of any medication;

(v)     Treatment, other than medication, for relief of pain or other symptoms;

(vi)    Other measures taken to relieve pain or other symptoms;

(vii)   Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

Having considered these factors, the ALJ may make a reasoned credibility determination based upon the evidence about whether the claimant acts, day in and day out, like a person would act who is really suffering from the symptoms the claimant alleges. This determination is especially important if there are inconsistencies between the claimant's testimony and the objective medical evidence. It is not necessary for the ALJ to recite findings on each factor, but the ALJ must give reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed. *See* SSR 96-7p; *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (ALJ must comply with SSR 96-7p in making a credibility determination by articulating the reasons behind the determination).

Because the ALJ evaluates the credibility by questioning and evaluating a live witness, the ALJ's credibility finding is reviewed deferentially and will not be set aside unless it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

2.      The ALJ's Credibility Determination

The ALJ found Ms. Fay met part one of the two-part test but that her statements concerning the intensity and persistence of her symptoms were not credible. In making this finding, the ALJ relied on the following: (1) the opinions of treating and testifying doctors, (2) inconsistencies within Ms. Fay's testimony and the medical evidence, (3) Ms. Fay's complaints to doctors regarding her pain and the doctors' perceptions and assessments of these statements, (4) Ms. Fay's medications, (5) the ALJ's observations of Ms. Fay at the hearing, and (6) her activities of daily living. As the Commissioner observes, the ALJ's analysis encompassed much more than Ms. Fay's statements about her activities of daily living.

The ALJ's discussion of those activities – although not as favorable to Ms. Fay as she would like – are not incomplete, contrary to Ms. Fay's assertion. She concluded that Ms. Fay's activities of daily living "show she is much more functional than she acknowledges," and the ALJ summarized those activities. (2nd Opinion, Tr. 389) This summary included findings that Ms. Fay lived alone, managed her home and finances, could be around crowds since she has attended class and played in an orchestra when possible, had graduated with a 4.0 GPA from IU with a baccalaureate degree and tutored while attending school, was attending graduate school, and worked "extensively on a computer." *Id.*[13]

The ALJ also provided further details of Ms. Fay's testimony about her activities of daily living. For example, in the discussion of her credibility, she noted that Ms. Fay reported she has good days and bad days, that her concentration "really suffers" on bad days, and that she can only sit for five to ten minutes until she becomes stiff. (2nd Opinion, Tr. 385) Earlier in the opinion, at step two, the ALJ thoroughly discussed Ms. Fay's activities of daily living. She mentioned that Ms. Fay's children help with household tasks and that Ms. Fay takes daily naps because of interrupted sleep. (2nd Opinion, Tr. 381) She also described Ms. Fay's flexible tutoring schedule and her arrangement in undergraduate school for special accommodations in class. (2nd Opinion, Tr. 381-82)

The court is satisfied that the ALJ did not just "select and discuss only the evidence that favors [her] ultimate conclusion" but articulated her analysis of the evidence sufficient to permit this court "to trace the path of [her] reasoning." *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Anderson v. Astrue*, No. 08 C 4917, 2009 WL 2366088 (N.D. Ill. 2009). Here, the ALJ noted

---

[13] On appeal, Ms. Fay criticizes the ALJ's focus on these activities because the ALJ omitted the facts that Ms. Fay required assistance and accommodation in doing some of these activities and that Ms. Fay's participation in the symphony orchestra had declined. These activities—even in the context of some limitations—support the ALJ's determination.

multiple times the testimony of Ms. Fay's activities of daily living that favored Ms. Fay, as outlined above. Despite some favorable testimony, the ALJ noted that most of Ms. Fay's testimony regarding her activities of daily living was not consistent with the pain she claimed to have. As noted before, if the evidence presented by the ALJ is such that "a reasonable mind might accept as adequate to support a conclusion," *id.*, this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman,* 546 F.3d at 462. The evidence of Ms. Fay's activities of daily living reasonably support the conclusion that her physical limitations are not as she claimed them to be.

The court rejects Ms. Fay's assertion that the ALJ inadequately discussed Ms. Fay's activities of daily living and further finds that the ALJ's credibility analysis was not "patently wrong."

## V. CONCLUSION

Because the ALJ did not violate the law of the case doctrine in finding Ms. Fay had no severe mental impairments, conducted a proper RFC assessment and a proper credibility analysis, the court can find no basis to overturn the Commissioner's decision that Ms. Fay does not qualify for disability benefits.

Therefore, the decision below is **AFFIRMED**. Final judgment will be entered accordingly.

So ORDERED.

Date:  08/22/2011

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Timothy J. Vrana
tim@timvrana.com